**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA :** | | |
| | : | **Case No: 21-cr-34 (CRC)** |
| **v.** | : | |
| | : | |
| **JACOB FRACKER,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' SENTENCING MEMORANDUM**
**AND MOTION FOR A DOWNWARD DEPARTURE**

Jacob Fracker, a police officer, was recruited by his friend, mentor, and supervisor, codefendant Thomas Robertson, to join the mob which attacked the U.S. Capitol on January 6, 2021, for the purpose of disrupting the peaceful transition of power, which he did.  On March 18, 2022, three weeks before trial, Fracker agreed to cooperate with the Government and pleaded guilty to a Superseding Information charging him with one count of conspiring with Robertson to obstruct the election certification proceedings in violation of 18 U.S.C. § 371.  Given Fracker's assistance to the Government's investigation and prosecution of codefendant Robertson, and considering the 18 U.S.C. § 3553(a) factors, the Government submits this memorandum in aid of sentencing and respectively moves for a downward departure pursuant to United States Sentencing Guidelines (U.S.S.G. or Guidelines) § 5K1.1. Given the nature and scope of Fracker's cooperation, the Government recommends that the Court impose a sentence of six months' probation with a condition of community confinement or home detention consistent with Zone B of the Guidelines.

### I.     FACTUAL BACKGOUND

Defendant Fracker stipulated to the factual basis in support of his guilty plea, ECF No. 71, summarized here.

### a.  The Attack at the U.S. Capitol on January 6, 2021

On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate met to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m.  Shortly thereafter, the House and Senate moved to separate chambers to resolve a particular objection. Vice President Mike Pence, a Secret Service Agency protectee, was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades and the U.S. Capitol Police line on the West Front, and advanced to the exterior façade of the building on the Upper West Terrace.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials. At this time, the certification proceedings were underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.

Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, at approximately 2:13 p.m., individuals in the crowd forced entry into the U.S. Capitol through the Senate Wing Door, including by breaking windows and by

assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the U.S. Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. Considering the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.

### b.  The Defendant's Role in the Capitol Attack

On January 6, 2021, Fracker and codefendant Robertson were off duty from their positions as police officers with the Rocky Mount Police Department in Rocky Mount, Virginia, where Robertson held a higher rank than Fracker.  Both Robertson and Fracker served in the U.S. military. Fracker had specialized training in handling crowd control and volatile situations, and during his military service spent time securing a military base in Qatar.

Robertson and Fracker were friends on Facebook. As early as November 7, 2020, Robertson began posting on Facebook about the illegitimacy of the 2020 presidential election and the necessity of retaliating with force. For example, on that date, he wrote: "A legitimate republic stands on 4 boxes. The soapbox, the ballot box, the jury box, and then the cartridge box. We just moved to step 3. Step 4 will not be pretty. I cannot speak for others, but being disenfranchised by

3

fraud is my hard line. I've spent most of my adult life fighting a counter insurgency. Im about to become part of one, and a very effective one." Fracker, who sometimes referred to Robertson as "dad," may have read this post by Robertson before January 6, 2021, and recalls specifically reading posts from Robertson about a forthcoming armed revolution.

After the November 7, 2021, presidential election, but before January 6, 2021, Robertson invited Fracker to join him on a trip to the District of Columbia on January 6, 2021.  On the morning of January 6, 2021, Fracker went to Robertson's house and together they drove with Robertson's neighbor to the District of Columbia in Robertson's car. Robertson brought for their use three gas masks, and both Robertson and Fracker traveled with their police identification badges and Rocky Mount Police Department-issued firearms. Robertson also brought a large stick.

Upon arrival in the D.C. metropolitan area, Robertson parked the car in a parking lot adjacent to a Metrorail (Metro) station which Fracker believes was in Virginia.  Robertson and Fracker agreed to leave their police identification badges and firearms in the vehicle and take the Metro to a stop near the Washington Monument. Robertson told Fracker not to have any police identification on his person. The firearms were not secured within the vehicle. Robertson paid for Metro tickets for himself, Fracker, and the neighbor.

Robertson, Fracker, and the neighbor arrived at the Washington Monument and listened to several speeches about allegations of purported election fraud. Fracker had agreed to join Robertson in the District of Columba, in-part, to hear what Trump was going to do about the purported stolen election, and whether the election was going to be overturned that day or if they needed to "buckle in" for the long haul.

Following the speeches, Robertson, Fracker, and the neighbor walked down Pennsylvania Avenue and approached the U.S. Capitol restricted area, where a mob was gathering.  During the

speeches, Fracker had learned more about Vice President Pence having a role to play in the election later that day, in part from a "crusty old guy" telling them that "if Mike Pence does whatever he says he is going to do, then the votes don't count." This information factored into their decision to continue to the U.S. Capitol Building as planned.

Robertson, Fracker, and the neighbor donned gas masks and approached the lower west terrace of the U.S. Capitol building, which was a restricted area on January 6, 2021. They joined an advancing mob of rioters armed with sticks and other paraphernalia.  Robertson carried a large wooden stick or club that Fracker had never seen Robertson carry before.

Metropolitan Police Department (MPD) Officers from Civil Disturbance Platoon Unit 42 (CDU-42) arrived at the U.S. Capitol after Fracker and proceeded in the restricted area to the lower west terrace to assist U.S. Capitol Police Officers attempting to hold back the mob. Based on his own law enforcement and combat experience, Fracker understood what these MPD officers were trying to do—they were attempting to keep the mob away from the Capitol building and control the crowd. At approximately 2:03pm, Robertson, Fracker, and Robertson's neighbor stood in the path of the MPD officers from CDU-42, and Robertson used his stick to impede the officers' path. Shortly after, Robertson and Fracker ran up the scaffolding on the West Front of the Capitol towards the Senate Wing Door of the U.S. Capitol Building, and they were briefly separated. Fracker remembered hearing "stop the steal" and "stop the fraud" being shouted throughout the crowd as he climbed the stairs.

At approximately 2:14 p.m. on January 6, 2021, Fracker entered the U.S. Capitol through the Senate Wing Door without lawful authority in a sea of rioters engaged in destructive and violent behavior. While inside the U.S. Capitol Building, he understood that something was going on in

the Capitol relating to Vice President Pence and the election, and that the rioters wanted to disrupt this.

After entering the building, Fracker looked for Robertson, and then walked into the U.S. Capitol Crypt where he found Robertson.  They took a selfie-styled photo making an obscene gesture in front of a statue of John Stark. They exited the building together, reunited with Robertson's neighbor, and drove back to Rocky Mount, Virginia.[1]

Throughout the day, both Robertson and Fracker used their mobile phones to take photos and video footage of their activity. In the car on the way home, Fracker, Robertson, and Robertson's neighbor discussed the fact that they believed they had successfully stopped the election from being stolen. Robertson remarked that this may be the way the next American civil war starts.

Social media corroborates Fracker's participation in the attack. On January 5, 2021, two new Senators were elected in Georgia. After the election results were announced Fracker participated in a group chat on Facebook in which one participant remarked that the next two years were going to be hard for gun owners. On January 6, 2021, Fracker responded to this message "Don't worry boys, we holding it down."  Later in the group chat, a friend implied that he [Fracker] was starting the "boog," and Fracker sent him pictures from the Capitol.  When a friend responds

---

[1] During Robertson's trial, Fracker testified that at this point, after the Crypt photograph, it did not seem that they needed to do anything more themselves to achieve their goal of stopping the proceedings.  Robertson Trial Tr. 4/7/22, at 830-31 (Fracker test.).  Fracker also confirmed that he and Robertson agreed to leave the building only after a group of U.S. Capitol police officers confronted them (who now, for the first time in the day, were outnumbered by enforcement) and ordered them to leave. Robertson Trial Tr. 4/6/22, at 736-42 (Fracker test.); Gov. Exs. 408 and 403A.

in the group chat that the news was reporting that the Senators were sheltering in place and barricading, Fracker responded "good."

Following his time inside the U.S. Capitol on January 6, 2021, Fracker bragged to his friends on social media that he had taken a "piss" in "Nancy P's toilet," referring to Nancy Pelosi, the Speaker of the House of Representatives, even though Fracker did not use a toilet in the Speaker's restroom that day.  He also stated in a Facebook post, referring to the John Stark photograph, "Lol to anyone who's possibly concerned about the picture of me going around... Sorry I hate freedom? Sorry I fought hard for it and lost friends for it? [emoji]...Not like I did anything illegal, WAY too much to lose to go there but y'all do what you feel you need to lol. And a foot note: I can protest for what I believe in and still support your protest for you believe in [emoji] just saying…after all, I fought for your right to do it…".

On January 7, 2021, Fracker sent a photo and multiple videos to a friend on Facebook. The photo depicted Fracker, dressed in a black sweatshirt with an American flag on the left side, standing in front of a statue which was holding a "Trump 2020, Make America Great Again" flag. After sending the photo but before sending the videos, Fracker told his Facebook friend "Don't share these. Just thought you should know there's hitters out here trying to make a fucking difference at any cost."  He also acknowledged he had assisted rioters who had gotten hit with tear gas, and, as an apparent explanation for the events of the day, wrote, "[y]ou put almost if not more than a million of us against…the 25 cops that were up there? Things are gonna get spicy."

## II.      THE CHARGES AND PLEA AGREEMENT

On March 18, 2022, Fracker pleaded guilty to a Superseding Information charging him with one count of conspiring with codefendant Robertson to obstruct the election certification proceedings in violation of 18 U.S.C. § 371.  Fracker was originally charged by Indictment, ECF

No. 18, with other offenses, including one count of 18 U.S.C. § 1512(c)(2).  The Government agreed in the plea agreement that if the Court accepted Fracker's guilty plea and the case proceeded to sentencing, the Government would dismiss the remaining counts against him.

### III.      DEFENDANT FRACKER'S COOPERATION

Fracker's substantial cooperation led directly to the conviction of his codefendant, Robertson.  This came at great personal cost to Fracker, as Robertson was his friend and mentor; their relationship was so close that Fracker routinely referred to Robertson as "dad."  Fracker also provided significant information about criminal conduct by Robertson that allowed the government to bring a felony evidence-tampering charge against him (for which Robertson was convicted at trial), as well as information about a third individual, Robertson's neighbor, who also was involved in the riot on January 6, 2021. For these reasons, described in further detail below, the Government requests that the Court depart downward and impose a sentence below the applicable Sentencing Guidelines.

Fracker's cooperation has been fulsome. Over the course of the investigation and prosecution of Robertson he (1) debriefed with the Government multiple times; (2) testified before the grand jury in the District of Columbia; (3) testified at trial against Robertson; and (4) gave the government valuable information in connection with firearms offenses committed by Robertson that remain under investigation.

Without Fracker's cooperation, the government would not have learned that Robertson destroyed two cell phones containing incriminating videos and photos taken on January 6.  With

this information the Government sought a superseding indictment charging Robertson with an additional obstruction count.[2]

On January 13, 2021, federal law enforcement officers separately called both Fracker and Robertson and informed them of outstanding warrants for their arrest and suggested that Robertson and Fracker turn themselves in to law enforcement, which they each agreed to do. Prior to turning himself in, Fracker drove to Robertson's house to drop off his daughter for Robertson's wife to watch. While at Robertson's house, Fracker gave Robertson his personal mobile phone, at Robertson's request, and Robertson put both Fracker's and his own phone into an ammunition can. Fracker did not retrieve his phone from Robertson's residence after being arrested, and Robertson told Fracker he "took care of" the phone. Fracker interpreted this comment from Robertson as meaning "problem solved," and that both phones had been disposed of.  Robertson did not tell Fracker where he took the phones, saying "it was better that way."   Upon investigating this information, the FBI found incriminating text messages on Robertson's new cell phone, in which he admitted to destroying his old phone by dumping it in a lake.  Based on Fracker's trial testimony, and that corroborating evidence found on Robertson's new phone, Robertson was convicted at trial of this additional felony charge.

In addition, Fracker's testimony substantially helped establish Robertson's corrupt intent to obstruct the proceeding.  Prior to Fracker's cooperation, the evidence of Robertson's intent relied on his social media postings, which Robertson sought to discount as online bragging. Fracker's testimony proved that, while he and Robertson were among the crowd of rioters at the

---

[2] In a letter recently filed with his sentencing memorandum, Robertson claims that Fracker destroyed the phones. ECF 121-1. This flies in the face of the evidence, and the jury's verdict in his trial.

West Front of the Capitol, it was understood between them that they would be going inside the building for the purpose of overturning the election results.

Robertson was Fracker's mentor, friend, and commanding officer at their police department, and Robertson recruited him to participate in the criminal conduct. Fracker was late to cooperate in our investigation, which the Government attributes in-part to the emotional challenge of testifying against somebody with whom he had a close, personal relationship, and who was his professional superior. Since agreeing to plead guilty, Fracker has not only provided considerable assistance to the government's investigation and prosecution of Robertson, but he has also shown substantial remorse for his behavior and describes himself as a changed man who is ashamed of his conduct in a genuine, credible manner. For these reasons, the Government requests that the Court depart downward pursuant to U.S.S.G. § 5K1.1 and impose a sentence of six months' probation with a condition of community confinement or home detention consistent with Zone B of the Guidelines.

## IV.    STATUTORY PENALTIES

As noted by the U.S Probation Office, the statutory maximum term of imprisonment for conspiracy is 5 years. ECF No. 125 at page 1. Fracker's felony conviction subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3).

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id*. at 49. The U.S.S.G. are "the product of careful study based on extensive empirical evidence derived from

10

the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id*. at 49.

### a. Sentencing Guidelines Calculation

The parties agree that the following Sentencing Guidelines apply:

| | |
|---|---|
| Base Offense Level, U.S.S.G. §§ 2C1.1; 2J1.2:[3] | 14 |
| Substantial Interference with Justice, U.S.S.G. §§ 2C1.1(c)(1); 2J1.2(b)(2): | +3 |
| Total Offense Level: | 17 |

The Specific Offense Characteristic in U.S.S.G. §2J1.2(b)(2) applies because the defendant's conduct "resulted in substantial interference with the administration of justice." This enhancement has been applied to all January 6 defendants convicted of a violation of Section 1512(c)(2), which was the object of the conspiracy to which Fracker pleaded guilty. The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted while legislators were physically evacuated for their own safety.

Pursuant to the plea agreement, the government recommends a three-level reduction for acceptance of responsibility, USSG §3E1.1. Based upon the stipulated guideline calculation, the total adjusted guideline offense level will be at least 14 prior to any downward departure.

### b. Guidelines Sentencing Range

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 14. At Offense Level 14, the Sentencing Guidelines range of incarceration is 15 to 21 months, which is in Zone D of the Sentencing Table.

### VI.   SENTENCING FACTORS UNDER 18 U.S.S.C. § 3553(a)

---

[3] Fracker's plea agreement included a guidelines calculation that assumed the application of U.S.S.G. § 2C1.1, rather than § 2X1.1, as probation proposes. There is no difference in the final offense level by application of § 2X1.1.

Once the Court calculates the defendant's advisory Guidelines range, it should consider the various factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49-50. The Court may consider all factual evidence relevant to the conduct of conviction that is proven by a preponderance of the evidence, including evidence not presented to the jury, without regard to the rules of admissibility at trial. *See United States v. Bell*, 795 F.3d 88, 103 (D.C. Cir. 2015) (citing *Rita v. United States*, 551 U.S. 338, 352 (2007)); U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). Applied to Fracker, the Section 3553(a) factors weigh in favor of a Guidelines sentence prior to any departure pursuant to U.S.S.G. § 5K1.1.

### a. The Nature of Circumstances of the Offense

First, the nature and circumstances of the offense support a significant sentence. The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events. The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991

F.3d 1273, 1284 (D.C. Cir. 2021).  Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself."  *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish.  This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).  Here, Fracker conspired with Robertson to stop the peaceful transfer of power on January 6.  Despite both men being military veterans and trained law enforcement officers, neither did anything to help the vastly outnumbered group of law enforcement officers who were trying to defend the building from the advancing mob.  Instead, they both joined that crowd and were in the initial wave of rioters who breached the building itself—the first breach of the day—leading to the suspension of the certification proceedings inside.

This was not a victimless crime.  The rioters injured more than a hundred members of law enforcement.  *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, available at https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries).  Some of the rioters, including defendant Fracker, wore tactical gear to help overcome efforts by law enforcement to stop them. Others used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety.  *Id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), available at https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

### b.  The History and Characteristics of the Defendant

The second factor that the Court must consider in fashioning an appropriate sentence is the history and characteristics of the defendant. Here, the history and characteristics of the defendant are mitigating. The defendant is a military veteran, who upon his return to civilian life became a police officer in his community who was entrusted with the power to enforce the criminal laws.  PSR ¶¶ 26, 117 (discussing the defendant's police employment).  He abused that power and trust when he participated in the Capitol attack.  But, by all accounts, he did so at the behest of his mentor and higher-ranking police supervisor, codefendant Robertson.  PSR ¶ 29; Trial Tr. 4/6/22

14

at 691 (Fracker test.) ("A: T.J. invited me to go with him…Q: Would you have gone to D.C. if Mr. Robertson had not invited you? A: No.").

Importantly, unlike Robertson, Fracker has taken full responsibly for his conduct, and, in emotional testimony at trial, when asked how he was feeling, described how he was ashamed of his actions at the Capitol and in the days afterward:

> "I feel weird. The person in those videos and the photos and that day -- at the time it was all fun and games. Here lately I've had it actually presented to me and shown to me for what it is. And that's not the person I am. That's not how I act. Like, I don't do those things. I don't behave like that. I wasn't raised like that. Like, I know for a fact my mom would slap me in the face if she had saw what I was doing that day. And so I sit here today just ashamed of my actions. I didn't have to do all that stuff, but I did."

Robertson Trial Tr. 4/6/22 at 756 (Fracker test.). Given Fracker's history it does appear that his conduct on January 6, 2021, was an aberration.

### c.   The Need for the Defendant's Sentence to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."  Fracker's conduct, conspiring to corruptly obstruct an an official proceeding, is the epitome of disrespect for the law.  In this way, a light sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### d.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." Id. at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id*. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the

democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to defendant Fracker does not weigh in favor of a lengthy term of incarceration, as the defendant has expressed remorse and contrition, has described himself to the Government as a changed man, and  proved the seriousness of his contrition through his substantial assistance in the investigation and prosecution of Robertson.  Fracker is not a member of any extremist groups, and his participation in the riots was derived, in some small part, out of a desire to keep codefendant Robertson safe. Robertson Trial Tr. 5/6/22 at 808. Given these factors, it seems very unlikely that a long sentence of incarceration will be necessary to deter future misconduct.

### e.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id*. at 101. As the Third Circuit has stressed:

> "The Sentencing Guidelines are based on the United States Sentencing Commission's in depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored."

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission both determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. To reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### f.  Unwarranted Sentencing Disparities

Fracker is the first defendant charged with offenses arising from the U.S. Capitol attack to be sentenced for his participation in a conspiracy, in violation of 18 U.S.C. §371.  He is also the

first defendant to be sentenced after entering into a cooperation agreement with the Government. Accordingly, no previously sentenced case arising from the January 6, 2021, Capitol attack presents a precise benchmark from which to evaluate the possibility of sentencing disparities.

Differences between Fracker's conduct, and that of other defendants that the Court may wish to consider when fashioning its sentence include whether the defendant had a confrontation with law enforcement officers, and if so, when, and where in relation to the overall riot; whether the defendant acted as a leader or motivator of others; whether the defendant was armed; whether the defendant took additional obstructive acts, like destroying evidence or threatening others; and whether the defendant accepted responsibility for his actions and cooperated with the government. And as these factors illustrate, avoiding unwarranted disparities requires the courts to consider not only a defendant's "record" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States* v. *Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government). Here, Fracker did not directly confront law enforcement in the aggressive manner that Robertson did, he did not act as a leader, was not armed, and accepted responsibility for his actions both in connection with his own guilty plea, and in sworn trial testimony against codefendant Robertson.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C.

Cir. 2011).  Two general restitution statutes provide such authority.  First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."  *Papagno*, 639 F.3d at 1096.  Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.  *Papagno*, 639 F.3d at 1096.  The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.  *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features.  Both require that restitution "be tied to the loss caused by the offense of conviction."  *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).  Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[4]  *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2).  Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.  *See Papagno*, 639 F.3d at 1097; § 3663(b); § 3663A(b).  Finally, under both statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.  *United States v. Bikundi*, 926 F.3d 761, 791

---

[4] The government or a governmental entity can be a "victim" for purposes of both the VWPA and MVRA.  *United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012).

(D.C. Cir. 2019).   The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result.  *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[5]  *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects.   As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49.  18 U.S.C. § 3663(a).  In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."  *United States v. Williams*, 353

---

[5] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review."  *Fair*, 699 F.3d at 513.

F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[6]

     Although the parties did not agree to a restitution amount as part of the plea agreement, applying these principles in this case leads to the conclusion that it would be appropriate to require Fracker to pay restitution.  His conspiracy conviction falls within the VWPA.  Rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building.  They caused extensive, and in some instances, incalculable, losses.  This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways.  *See e.g.,* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), available at https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues).  The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.  Fracker's conduct, in conjunction with that of many other rioters, directly and proximately resulted in

---

[6] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. § 3663(a)(1)(B)(ii); 18 U.S.C. § 3663A(c)(3)(B).

damage to the Capitol building and grounds and losses suffered by law enforcement officers deployed to protect Members of Congress, their staff, and other Capitol employees.

A "reasonable estimate," *Gushlak*, 728 F.3d at 196, of the restitution for which Fracker should be responsible is $2,000. That is the same amount that defendants convicted of felony offenses in connection with the events of January 6 have typically agreed to pay under their plea agreements.

The VWPA and MVRA also provide that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d); 18 U.S.C. § 3663A(d). Because this case essentially involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h).

Fracker's crimes on January 6 affected several entities responsible for the Capitol building, among them the Architect of the Capitol, the Office of the Chief Administrative Officer of the United States House of Representatives, and the Office of the Secretary of the United States Senate. Attached as Sentencing Exhibits 1 through 3 are letters from each of these three entities, attesting to the pecuniary damages each suffered because of the attack on the Capitol on January 6: $1,253,354.01, $547,411.27, and $32,075.00, respectively. That is a total amount of $1,832,840.28, which does not even account for the damages suffered by the Capitol Police,

23

Metropolitan Police Department, or myriad other law enforcement entities.[7]

## VIII.   CONCLUSION

For the reasons set forth above, the Government recommends that the Court depart downward from the applicable Sentencing Guidelines level and impose a sentence of six months' probation with a condition of community confinement or home detention consistent with Zone B of the Guidelines. The government further recommends that the Court impose a term of supervised release of 3 years, restitution of $2,000, and the mandatory $100 special assessment for the felony count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    /s/ *Elizabeth Aloi*
Elizabeth Aloi
Risa Berkower
Assistant United States Attorneys
601 D Street, N.W.,
Washington, D.C. 20530
(202) 252-7212 (Aloi)
Elizabeth.Aloi@usdoj.gov
Risa.Berkower@usdoj.gov

---

[7] The Government estimates that, as of April 5, 2022, the approximate total losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.