## IN THE UNITED STATES DISTRICT COURT
## FOR WASHINGTON D.C.

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:21-CR-00034-002** |
| | ) | **The Hon. Christopher R. Cooper** |
| **JACOB FRACKER** | ) | **Sentencing: August 19, 2022** |
| **Defendant.** | ) | |

### DEFENDANT'S POSITION ON SENTENCING

Jacob Malone Fracker  has received and reviewed the Pre-sentence Investigation Report prepared by Probation Officer Sherry Baker. Mr. Fracker has no factual disputes with the information contained therein, nor does he have any dispute with the PSR's calculation of the advisory Guidelines range of 15 to 21 months. However, Mr. Fracker would respectfully suggest that a sentence of probation or homr confinement is sufficient but not greater than necessary to account for each of the Section 3553(a) factors.

### FACTUAL BACKGROUND

The Defendant agrees that the PSR and the Statement of Facts signed by the defendant (previously submitted to and filed in the court record) adequately set forth the offense conduct in this case. Mr. Fracker has pled guilty to a one count criminal information charging him with Conspiracy to Obstruct an Official Proceeding, in violation of Title 18, United States Code, sections 371.

In essence, Mr. Fracker, a US Marine Corp veteran who had honorably served his country in combat in foreign countries and bears the physical and emotional scars of that service, was a police officer in his hometown of Rocky Mount Virginia at the time of the January 6th 2021 incident (hereinafter "J6") . His superior officer, mentor and surrogate father figure was his ex-codefendant, Thomas Robertson. A few days prior to J6 Robertson invited him to go on a road trip to Washington to "see the president speak at a rally."  It is not disputed that Mr. Fracker, who was not particularly politically involved or motivated, would never have come to Washington on J6 had he not been invited to go by Mr. Robertson.

Early on J6 Mr. Robertson, Mr. Fracker and a neighbor of Mr. Robertson met at Robertson's house for the trip to Washington. Mr. Robertson supplied gas masks (having seen in media over the year prior to this event tear gas and pepper-spray employed at many demonstrations and protests at various places around the country - including Washington DC) and military MRE-style meals for all three men for the trip, and drove them to the Washington area. As Probation Officer Baker wrote in Mr. Fracker's PSI report, "codefendant Robertson recruited, organized and outfitted defendant Fracker." (Par 55). Although Robertson also took a wooden stick or post (appearing to be approximately 2" x 2" x 4 feet long) with him, Mr. Farcker took no stick, nor any other weapon or weapon-like object into Washington.

Upon arriving in the Northern Virginia area, Mr. Robertson parked in a METRO parking lot and purchased farecards for them all to use the METRO, which they took to DC - AFTER leaving their police shields, ID cards and police firearms in the car. They attended President Trump's rallly on he Ellipse, then walked with thousands of others in the crowd toward the

Capitol. It is undisputed that it was obvious to any reasonable person when they arrived at the Capitol that the area was closed off to the public and vastly outnumbered police were actively trying to prevent the massive crowd from approaching and entering the immediate Capitol grounds and building, and that tear gas and/or other chemical agents were being used to deter the crowd. It is also undisputed that at one point the three men stood in a line in the dense crowd and faced a group of officers in riot gear attempting to pass them. Although Robertson - who had been carrying the large stick - attempted to block or thwart the officers with the stick, it is undisputed that Mr. Fracker had no stick or any other weapon at the time, and yielded as the officers moved forward between the three men without touching any of the officers.

It is also undisputed that Mr. Fracker and Mr. Robertson then walked with the crowd up a staircase and across a plaza to the entrance to the Capitol (with Mr. Fracker a few feet ahead of Mr. Robertson), where they and many hundreds of other persons entered through doors that had been forced open shortly before, and walked a short distance to the Statuary Hall in the Crypt area of the Capitol. They remained in this area for about 20 minutes, chanting with the crowd and taking selfie photos, then left the building, found the third of their party, and left Washington.

A few days later, upon learning that they had been identified by social media posts they had both made and were both going to be arrested by the FBI, Mr. Fracker and Mr. Robertson agreed to turn themselves in. Mr. Fracker traveled to Robertson's house with his daughter so Robertson's wife could care for her while the men turned themselves in to the authorities. In Mr. Robertson's garage, Mr. Robertson told Mr. Fracker to give Robertson his cell phone, which Mr. Robertson put in a box together with his own. When Mr. Fracker asked what he was going to do

with them, Mr. Robertson said, "It's better you don't know."[1]

While Mr. Fracker is ashamed and embarrassed of his activities in connection with the J6 events and its aftermath and is painfully aware of the magnitude of what he has done, it is undisputed that, while at the Capitol,  Mr. Fracker entered through an open door (albiet to the sounds of alarms and a frenzied crowd, the smell of tear gas and plainly visible nearby broken windows), never attempted to enter any private offices or the House or Senate Chambers,  did not personally break anything in the building or grounds, did not steal anything, and did not assault any officers or other Capitol personnel. It is also undisputed that Mr. Fracker (through counsel) sought from an early stage to take responsibility for his actions and sought for months to negotiate a plea with the Government, and has done everything in his power to make up for his actions connected with these events, including debriefing completely and honestly numerous times with multiple prosecutors and FBI agents, testifying before Gand Juries, providing

---

[1] While Mr. Robertson has claimed that it was actually Mr. Fracker who took and destroyed their cell phones, this is simply not credible, and does not merit any serious discussion. As Mr. Fracker was clearly the junior man and Mr. Robertson was his superior, mentor and "father figure," it would be completely out of character for that relationship for Mr. Fracker to have taken that action, undirected and on his own. Mr. Fracker routinely sought out Mr. Robertson's advice in most important matters of his life. Mr. Fracker did what Mr. Robertson told him, and not the other way around. As the men were storing their phones in Robertson's garage prior to going in to be arrested so the phones would not be seized, Mr. Robertson's assertion would have meant Mr. Fracker would have had to return to the Robertson garage later on his own and retrieve and dispose of the phones, which Mr. Robertson did not claim to anyone. He also asserted that Mr. Fracker had "lied **multiple times** to the FBI" about this, yet he would have had absolutely no knowledge of what Mr. Fracker said to the FBI, or **how many times** he might have said it. Finally, and most importantly, Mr. Robertson sat and watched Mr. Fracker testify as to this event fully under oath at his trial. Mr. Robertson was then free to likewise testify under oath and refute this, if he wanted to. However he chose to sit silently and not dispute these facts at the time, choosing instead to respond with his own alternative version of the facts in an unsworn sentencing letter to the Court calling Mr. Fracker's statements lies. It is curious how Robertson, a father figure, mentor and commanding officer to Fracker, chose to throw his disciple under the bus and blame him for the two most troubling of Mr. Robertson's own actions (entering the Capitol and destroying the phones) when it suited him, to try and manufacture any excuse for his own actions at the time of sentencing.

continuing assistance to the Government in ongoing investigations, and testifying at Mr. Robertson's trial.

## ARGUMENT

**Application of Sentencing Factors Pursuant to 18 U.S.C. Section 3553(a) Support a Sentence of Less than 15 Months.**

**A.      Legal Standard**

Congress has mandated that federal courts impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. Section 3553(a). In *Kimbrough v. United States,* 552 U.S. 85, 128 S.Ct. 558 (2007), and *Gall v. United States, 552* U.S. 38 (2007), the Supreme Court held that the Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in 18 U.S.C. Section 3553(a). In two summary reversals, the Court further made clear that the Guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors. *Nelson v. United States* 129 S. Ct. 890 (2009), 2009 WL 160585 (Jan. 26, 2009); *Spears v. United States,* 129 S. Ct. 840 (2009), 2009 WL 129044 (Jan. 21, 2009). "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," the Court held in *Nelson.* 2009 WL 160585, at *1. "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Id.* at *2 (emphasis in original). In other words, sentencing courts commit legal error by using a Sentencing Guidelines range as a default to simply be imposed unless a basis exists to impose a sentence outside that range.

**B.**     **Section 3553(a) Factors**

After calculating  the Guidelines, a sentencing court must then consider that Guidelines

range, as well as the sentencing factors set forth in Section 3553(a), and determine a sentence that

is appropriate and reasonable for the individual defendant.  *Nelson*, 555 U.S. at 351; see also

*United States v. Hughes*, 401 F.3d 540, 543 (4th Cir. 2005). Among the factors the Court must

consider are the nature and circumstances of the offense, the history and characteristics of the

defendant, the need for the sentence imposed to reflect the seriousness of the offense, to promote

respect for the law, to provide just punishment, to afford adequate deterrence to criminal conduct,

to protect the public from further crimes of the defendant, and to provide the defendant with

needed educational or vocational training, medical care, or other treatment in the most effective

manner. Mr. Fracker would urge the Court to consider that a sentence of a period of probation or

house arrest with community service would be adequate to address all these factors - especially in

the current situation, where Mr. Fracker's life has already been so ill-affected by the fallout

resulting from his own actions.


**i. Nature and circumstances of the offense.**

Clearly, it cannot be argued that this was not a serious offense. As is plainly obvious, the

actions of the thousands of people who converged on Washington on January 6, 2021, over-ran

barriers set up around the Capitol building, resisted police efforts to contain them and entered the

Capitol building without authorization in an attempt to stop the legitimate certification of the

new president was not only a crime, but a danger to our society and the fabric of our democracy.

However, the government has not presented any evidence that Mr. Fracker planned in advance to

enter the Capitol, and his statements under oath at the trial of his ex co-defendant made clear that he came to Washington that day at the invitation of the co-defendant, Mr. Robertson, in order to "see the president speak" and attend a rally. As he testified at Mr. Robertson's trial, the idea of actually invading the Capitol building was formed in the moments just prior to doing it, along with the rest of the crowd.

Although Mr. Fracker is an adult and is of course responsible for his own actions, it is undisputed that his actions were to a great extent the result of the influence of his mentor and father figure, a man he loved, trusted and respected, and whom he believed from what he had been told held the same values and had been through the same set of life-or-death military service experiences as he had. He didn't find out until just recently that Mr. Robertson had lied about almost all of it. Mr. Fracker was the victim of Mr. Robertson's lies more than anyone else, because he truly lost the life and career that meant so much to him, due largely to Mr. Robertson's urging. However, Mr. Fracker was raised to believe in personal responsibility. He realizes he is not before the court because Mr. Robertson twisted his arm, he is here because he made decisions he should not have made, regardless of who encouraged him to do so. He is ready to pay the penalty for those decisions.

With some glaring exceptions in January of 2021, Mr. Fracker has spent his entire life trying to do the right thing. What goes hand-in-hand with spending one's life trying to do the right thing is the knowledge and understanding that there is a price to be paid for doing the wrong thing. Mr. Fracker now stands before the Court ready to pay that price, whatever it is. However, counsel would urge the Court to not let the actions of one day in an otherwise admirable and courageous life wound this young man in a way that would prevent him from moving on.

### ii. History and Characteristics of the Defendant

Mr. Fracker was born into a military family. His father was on active duty in the US Army until 2016. Although his parents divorced when he was approximately 5 years old, he learned and absorbed the military service and the value-set associated with it at an early age. As Mr. Fracker's father wrote in a letter to this Court, ". . .  (e)ver since he was a little boy, he has wanted to be a soldier." He participated in the Junior ROTC drill team and honor guard in high school. He cut classes in high school on his 18th birthday so he could go to a military recruiter's office and enlist in the US Marine Corps, entering in October of 2010 and separating in October 2014. He served his country admirably in Afghanistan and in other foreign deployments. His service includes deployments in the following locations: Marjah, Helmand Province Afghanistan for area stabilization and counter insurgency operations (December 15, 2011 until July 7, 2012); Camp Leatherneck where he conducted helicopter raids on local bomb manufacturers and opium suppliers throughout the Southwestern part of Afghanistan (January 13, 2013 until May 1, 2013); and Okinawa, Japan where he was part of a training force for the Royal Thai Marine Corps, Malaysian Army Rangers and Airborne units, as well as Filipino Marine Corps (February 16, 2014 until August 8, 2014).( PSR, par 111).

He was wounded in action in Afghanistan and still carries bullet fragments in his body. As Probation Officer Baker described in her report, after Mr. Fracker was injured in action in 2013. He was diagnosed with Post Traumatic Stress Disorder (PTSD), depression and anxiety, for which he takes prescription medications. (PSR, Par 100). He has obtained treatment (and continues to be treated) for these conditions at the Veterans Administration Medical Center in Salem, Virginia.

Following his honorable discharge from the Marine Corps he then enlisted in the US Army National Guard  Reserve in March of 2015, including active duty deployments overseas from 2016 to 2017. He remained in the Army National Guard  Reserve until being discharged due to the instant case earlier this year (PSR, par 114).

Following his active duty military career, Mr. Fracker continued on his path of service to community and country by joining his local police department. Mr. Fracker was a patrolman for the Rocky Mount Police Department in Virginia from December 12, 2017 until he was terminated for his involvement in the instant offense in January of 2021. (PSR, par 117). In fact, up until the afternoon of January 6, 2021 Mr. Fracker had proven by his lifelong choices, his actions and his dedication to his country and his community that he was on a path of honor and service.

There is no question that Mr. Fracker made terrible choices in connection with the J6 activities, but it must be taken into consideration that 1) these choices and his activities on J6 were not made for personal gain, but because of a misguided false belief that his actions were altruistic and for the good of the country, 2) these choices were made in large part due to the influence of a mentor and father-figure he admired and trusted completely, and (like so many hundreds of others) in some part due to getting carried away in the spirit of the moment that day, 3) he immediately turned himself in to authorities upon being told he was being charged, and 4) he has done all he can do to make up for his actions by cooperating completely with the government and assisting in the case against his co-defendant - at great personal cost, due to the high regard in which his co-defendant Mr. Robertson was held in the local community and in the social circle of police officers in which they both traveled..

-9-

### iii.    Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant

Undersigned counsel would suggest a probationary or house arrest sentence with community service would be appropriate in this situation. It is not an overstatement to say that Mr. Fracker has been performing community service virtually continuously since the day he left high school, up until this very brief aberration.  He has already paid dearly for his actions. He has lost forever the military and police careers to which he aspired his entire life and which gave him a sense of purpose and identity. He has been drummed out of the military he gave so very much to for many years (the Army Reserve has discharged him based on his conviction). He has lost the respect of the community and his sense of belonging in a place he has always called home, in which many people ON BOTH SIDES OF THE SPECTRUM now revile him - some for what they perceive he did to his country on J6, and some for what they perceive he has NOW done to his co-defendant, who is still held in high regard by many in that area. More important, he has lost his sense of self-respect due to what he has done.  Finally, in his mind perhaps the worst result of this case is that he is terrified of losing the respect of his young daughter. She is too young to be told of these events and understand why he is no longer a policeman, and he dreads the day she is old enough to understand and he will have to explain to her what he has done.

Based on all of the above, it is entirely unlikely he will ever re-offend in any way in his life. As a direct result of his poor decisions, he has lost most of what was important to him in his life. In addition, far from his former life of respect and authority, Mr. Fracker is now employed part time as a trainer in a health club. Even without incarceration, his fall from grace due to his

actions serves not just as an "adequate" deterrence to criminal conduct, but an abject lesson to anyone who would ever consider similar actions in the future.

In this very unique situation, a probationary sentence is sufficient to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes.

Clearly Mr. Fracker will not recidivate. First and foremost, even without having served one day in jail, for the reasons related above the price he has already paid for his actions has been much too dear. Second, he will have to find a substitute for the life of service that he planned out so carefully, which will no longer be possible for him due to his criminal record.

Finally, and most importantly, the proof that Mr. Fracker will not recidivate is obvious in the fact that he has truly taken responsibility for his own actions. He has done all he possibly could to make up for his actions and show the Court he is truly sorry for his actions. He realizes he has already lost so much that he valued in his life, and he stands to lose everything else that he values in his life if he is ever again involved with similar activities or other illegal acts.  He is ready to accept that and start over on an entirely different level, with different expectations.


## **<u>CONCLUSION</u>**

Mr. Fracker agrees with the PSR's assessment that the properly calculated advisory Guidelines range is 15 to 21 months. However, Mr. Fracker respectfully requests a sentence of a combination of house arrest, probation and community service, for the reasons set out above.


-11-

Respectfully submitted,
JACOB MALONE FRACKER
By Counsel,
Respectfully submitted,

/s/

_____
Bernard F. Crane (D.C. Bar #386978)
10521 Judicial Drive, Suite 105
Fairfax, Virginia 22030
202 429-2900
Email: berncr@aol.com


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of August, 2022, I will electronically file the foregoing with the Clerk of court using the CM/ECF system. which will then send a notification of such filing (NEF) to the following:

Elizabeth Aloi, Esquire AUSA
Resa Berkower, Esquire, AUSA
United States Attorney's Office
601 D Street, NW
Washington, DC 200


ATTACHMENTS:

Jacob Fracker, letter to Court
Laura Price letter (defendnat's mother)
Roger Fracker letter (defendant's father)
John Fracker letter (defendant's brother)_